United States District Court

Middle District of Florida

Tampa Division

Brittany Williams                                 Case No.: 8:21-cv-1957- WFJ-SPF

(Plaintiff)

Vs.

Professional Marketing & Management Inc.

(Defendant)

## Lawsuit

Filed in the Tampa Division Middle District Court in pursuant to Rule 32 and 7004(a) (1) of the Florida Rules of Civil Procedure, Brittany Williams (Plaintiff), foregoing, mailing address at 14330 58th St. N #4102, Clearwater, FL 33760, has filed a lawsuit against Professional Marketing & Management Inc. (Defendant), foregoing, located at 2200 Gladys St. Largo, FL 33774, which is where Plaintiff signed her lease, for violation of the Title II of the Florida Civil Rights Act of 1964, also known as business tort, for gender discrimination, violation of the Federal Fair Housing Act for failure to negotiate the past due rent, for premises liability according to Florida law for the apartment complex lacking security, and for violation of Florida S.S. 760.01 FS, which is the Florida Civil Rights Act of 1992 , Injunctive Relief against Discrimination in Places of Public Accommodation for displaying race, color, and religion discrimination.

Title II of the Civil Rights Act of 1964 prohibits discrimination in numerous settings including: employment, education, voting, and public accommodations. Specifically, Title II prohibits discrimination on the basis of race, color, religion,

or national origin in places of public accommodations and provides injunctive relief for such violations.

SEC. 201. (a) All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, and privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin.

(b) Each of the following establishments which serves the public is a place of public accommodation within the meaning of this title if its operations affect commerce, or if discrimination or segregation by it is supported by State action:

(1)  any inn, hotel, motel, or other transient guests, other than an establishment
located within a building which contains not more than five rooms for rent
 (2)  or hire and which is actually occupied by the proprietor of such establishment as his residence;

(3) any restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility principally engaged in selling food for consumption on the premises, including, but not limited to, any such facility located on the premises of any retail establishment; or any gasoline station;

(4) any motion picture house, theater, concert hall, sports arena, stadium or other place of exhibition or entertainment; and

(5)  any establishment (A)(I) which is physically located within the premises of any establishment otherwise covered by this subsection, or (i) within the premises of which is physically located any such covered establishment, and (B) which holds itself out as serving patrons of such covered establishment.

-2-

(c) The operations of an establishment affect commerce within the meaning of this title if (1) it is one of the establishments described in paragraph (1) of subsection (b); (2) in the case of an establishment described in paragraph

(1) of subsection (b), it serves or offers to serve interstate travelers or a substantial portion of the food which it serves, or gasoline or other products which it sells, has moved in commerce;

(2) in the case of an establishment described in paragraph (3) of subsection (b), it customarily presents films, performances, athletic teams, exhibitions, or other sources of entertainment which move in commerce; and (4) in the case of an establishment described in paragraph (4) of subsection (b), it is physically located within the premises of, or there is physically located within its premises, an establishment the operations of which affect commerce within the meaning of this subsection. For purposes of this section, "commerce" means travel, trade, traffic, commerce, transportation, or communication among the several States, or between the District of Columbia and any State, or between any foreign country or any territory or possession and any State or the District of Columbia, or between points in the same State but through any other State or the District of Columbia or a foreign country.

(d) Discrimination or segregation by an establishment is supported by State action within the meaning of this title if such discrimination or segregation (1) is carried on under color of any law, statute, ordinance, or regulation; or (2) is carried on under color of any custom or usage required or enforced by officials of the State or political subdivision thereof; or (3) is required by action of the State or political subdivision thereof. (e) The provisions of this title shall not apply to a private club or other establishment not in fact open to the public, except to the extent that the facilities of such establishment are made available to the customers or patrons of an establishment within the scope of subsection (b). SEC.

202. All persons shall be entitled to be free, at any establishment or place, from discrimination or segregation of any kind on the ground of race, color, religion, or national origin, if such discrimination or segregation is or purports to be required by any law, statute, ordinance, regulation, rule, or order of a State or any agency or political subdivision thereof.

SEC. 203. No person shall (a) withhold, deny, or attempt to withhold or deny, or deprive or attempt to deprive, any person of any right or privilege secured by section 201 or 202, or (b) intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person with the purpose of interfering with any right or privilege secured by section 201 or 202, or (c) punish or attempt to punish any person for exercising or attempting to exercise any right or privilege secured by section 201 or 202.

SEC. 204. (a) Whenever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice prohibited by section 203, a civil action for preventive relief, including an application for permanent or temporary injunction, restraining order, or other order, may be instituted by the person aggrieved and, upon timely application, the court may, in its discretion, permit the Attorney General to intervene in such civil action if he certifies that the case is of general public importance. Upon application by the complaint and in such circumstances as the court may deem just, the court may appoint an attorney for such complaint and may authorize the commencement of the civil action without the payment of fees, costs, or security.

(b) In any action commenced pursuant to this title, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs, and the United States shall be liable for costs the same as a private person.

(c) In the case of an alleged act or practice prohibited by this title which occurs in a State, or political subdivision of a State, which has a State or local law prohibiting such act or practice and establishing or authorizing a State or local authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, no civil action may be brought under subsection (a) before the expiration of thirty days after written notice of such alleged act or practice has been given to the appropriate State or local authority by registered mail or in person, provided that the court may stay proceedings in such civil action pending the termination of State or local enforcement proceedings.

(d) In the case of an alleged act or practice prohibited by this title which occurs in a State, or political subdivision of a State, which has no State or local law prohibiting such act or practice, a civil action may be brought under subsection

(a): Provided, That the court may refer the matter to the Community Relations Service established by title X of this Act for as long as the court believes there is a reasonable possibility of obtaining voluntary compliance, but for not more than sixty days: Provided further, That upon expiration of such sixty-day period, the court may extend such period for an additional period, not to exceed a cumulative total of one hundred and twenty days, if it believes there then exists a reasonable possibility of securing voluntary compliance.

SEC. 205. The Service is authorized to make a full investigation of any complaint referred to it by the court under section 204(d) and may hold such hearings with respect there to as may be necessary. The Service shall conduct any hearings with respect to any such complaint in executive session, and shall not release any testimony given therein except by agreement of all parties involved in the complaint with the permission of the court, and the Service shall endeavor

to bring about a voluntary settlement between the parties.

SEC. 206. (a) Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by this title, and that the pattern or practice is of such a nature and is intended to deny the full exercise of the rights herein described, the Attorney General may bring a civil action in the appropriate district court of the United States by filing with it a complaint (1)signed by him (or in his absence the Acting Attorney General), (2) setting forth facts pertaining to such pattern or practice, and (3) requesting such preventive relief, including an application for a permanent or temporary injunction, restraining order or other order against the person or persons responsible for such pattern or practice, as he deems necessary to insure the full enjoyment of the rights herein described.

(b) In any such proceeding the Attorney General may file with the clerk of such court a request that a court of three judges be convened to hear and determine the case. Such request by the Attorney General shall be accompanied by a certificate that, in his opinion, the case is of general public importance. A copy of the certificate and request for a three-judge court shall be immediately furnished by such clerk to the chief judge of the circuit (or in his absence, the presiding circuit judge of the circuit) in which the case is pending. Upon receipt of the copy  of such request it shall be the duty of the chief judge of the circuit or the presiding circuit judge, as the case may be, to designate immediately three judges in such circuit, of whom at least one shall be a circuit judge and another of whom shall be a district judge of the court in which the proceeding was instituted, to hear and determine such case, and it shall be the duty of the judges so designated to assign the case for hearing at the earliest practicable date, to participate in the hearing and determination thereof, and to cause the case to be

in every way expedited. An appeal from the final judgment of such court will lie to the Supreme Court. In the event the Attorney General fails to file such a request in any such proceeding, it shall be the duty of the chief judge of the district (or in his absence, the acting chief judge) in which the case is pending immediately to designate a judge in such district to hear and determine the case. In the event that no judge in the district is available to hear and determine the case, the chief judge of the district, or the acting chief judge, as the case may be, shall certify this fact to the chief judge of the circuit (or in his absence, the acting chief judge) who shall then designate a district or circuit judge of the circuit to hear and determine the case.

It shall be the duty of the judge designated pursuant to this section to assign the case for hearing at the earliest practicable date and to cause the case to be in every way expedited.

SEC. 207. (a) The district courts of the United States shall have jurisdiction of proceedings instituted pursuant to this title and shall exercise the same without regard to whether the aggrieved party shall have exhausted any administrative or other remedies that may be provided by law.

(b) The remedies provided in this title shall be the exclusive means of enforcing the rights based on this title, but nothing in this title shall preclude any individual or any State or local agency from asserting any right based on any other Federal or State law not inconsistent with this title, including any statute or ordinance requiring nondiscrimination in public establishments or accommodations, or from pursuing any remedy, civil or criminal, which may be available for the vindication or enforcement of such right.

The Civil Rights Act of 1968, more commonly known as the Fair Housing Act, was the third major civil rights law passed in the 1960s. It followed the Civil

Rights Act of 1964, which outlawed discrimination and Jim Crow segregation in employment, schools and public places, and the Voting Rights Act of 1965, which outlawed racial discrimination in voting. The Fair Housing Act, passed a week after the assassination of Dr. Martin Luther King Jr., has a complicated history.

The Fair Housing Act prohibits discrimination in the sale, rental, and financing of housing based on race, color, national origin, religion, sex, familial status, and disability. The Fair Housing Act has two main purposes—one is to prevent discrimination and reverse housing segregation. The part of the law that calls for the reversal of segregation is necessary because decades of unjust government practices have led to the presence of housing segregation today. Research shows that people of color are most likely to live in neighborhoods with limited access to good jobs, healthy food, adequate schools, and other resources needed for success. Jurisdictions enforcing desegregation is one way to work towards a more integrated society where everyone has equal access to opportunity.

The Fair Housing Act protects people from discrimination when they are renting or buying a home, getting a mortgage, seeking housing assistance, or engaging in other housing-related activities. Additional protections apply to federally-assisted housing.

In addition, it is illegal discrimination to:

Threaten, coerce, intimidate or interfere with anyone exercising a fair housing right or assisting others who exercise the right to retaliate against a person who has filed a fair housing complaint or assisted in a fair housing investigation.

Since the passage of the Fair Housing Act, people have brought many cases of housing discrimination to court and have won those legal battles. There has also been an increase in accessible housing available to individuals with disabilities.

Recently under the Obama administration, the definition of fair housing enforcement expanded.

Premises liability claims are considered a specific form of negligence claim under Florida law. This means that, in order to win a premises liability claim, Florida law requires you to prove all four elements of a negligence action:

The property owner or manager owed you a duty of care;

The property owner or manager breached the duty of care owed to you;

This breach caused you to suffer injuries;

Actual damage resulted to you.

In Florida, all four of the above-listed elements must be proven by a preponderance of the evidence in order to prevail on a premises liability claim. Stated differently, all you must do to bring a successful premises liability claim in Florida is to present evidence that shows it is more likely than not that the property owner or manager owed you a duty of care, breached this duty, and you suffered physical or other economic injuries as a result of this breach.

A premises liability claim has a statute of limitation of four years from the date of the incident.

760.01   Purposes; construction; title.—

(1)   Sections 760.01-760.11 and 509.092 shall be cited as the "Florida Civil Rights Act of 1992."

(2)   The general purposes of the Florida Civil Rights Act of 1992 are to secure for all individuals within the state freedom from discrimination because of race, color, religion, sex, pregnancy, national origin, age, handicap, or marital status and thereby to protect their interest in personal dignity, to make available

to the state their full productive capacities, to secure the state against domestic strive and unrest, to preserve the public safety, health, and general welfare, and to promote the interests, rights, and privileges of individuals within the state.

(3) The Florida Civil Rights Act of 1992 shall be construed according to the fair import of its terms and shall be liberally construed to further the general purposes stated in this section and the special purposes of the particular provision involved.

## Memorandum of Law

1. In January 2018, Plaintiff came into contact with Defendant to lease a three bedroom apartment for her and her four children. Plaintiff signed a lease agreement on January 31st, 2018 for a three bedroom apartment in the amount $995.00 a month.

2. The first issue arose when Plaintiff was misled into a lease agreement with a doubled security deposit. According to the lease agreement, the security deposit was suppose to be $995.00 a month, but the payment receipt shows $1990.00 paid for security deposit and the extra month's rent obviously included was not applied anywhere on Plaintiff's, the now known fraud compromised Plaintiff financial plans for rent. Plaintiff states that no month was comfortable afterwards *Adams & United States v. Matthews (Longview Independent School District August 27, 1970)*.

3. The next issue was when the Plaintiff had a broken window and it took over a month to get it fixed. Plaintiff says things were ok for a while although she was late for rent, rent was paid up until Plaintiff lost her job around May of 2018 *(Anderson & United States v. Madison County School District May 1999)*

4. Once Plaintiff lost her job around May of 2018, she came in contact with several agencies to get her rent. Plaintiff says she spoke with someone by the

name of Rick in July of 2018 at the property's phone number and he provided

Plaintiff with his email to be emailed a copy of the rental assistance paperwork

*Baltimore Neighborhoods, Inc. v. Rommel Builders, Inc. (D. Md.) April 21, 2000.*

5. Plaintiff later found out that Rick is the property manager of Defendant.

6. Before the eviction, Plaintiff never received a response from anyone in the front office again.

According to the Federal Fair Housing Act, a landlord must negotiate with tenant. The property manager and business owner violated this Act at the time of applying for an eviction done without negotiating the rental assistance that was willing to be provided to the Defendant in July of 2018.

7. The next issue arises when Plaintiff was being evicted. At the time of eviction, whether done legally or not, Colleen (property owner), and Rick(property manager) came with Deputy Johnston of the Pinellas County Sheriff's Department on August 17, 2018. Plaintiff asked for her belongings including important paperwork such as driver's license, social security cards, birth certificates, divorce proceedings, habitat for humanity application to be a home owner one day, credit cards and bank cards, clothes, furniture, and business products, as well as music written by her.

8. On the day the Plaintiff asked for her belongings, she was told no. Defendant employees were dressed in causal Christian clothing. Plaintiff can identify the clothing as a religion because she used to own the same type of clothing and practiced Christian religion.

9. Plaintiff called 911 for help. The 911 operator said she would send someone for help. The supervisor of the arriving law enforcement came to the scene. Plaintiff asked the supervisor for the captain because Deputy Johnston and the

landlord still was denying Plaintiff her property.

10. Plaintiff called 911 again when the supervisor was refusing to allow her along with deputy Johnston to gather her belongings. That's when a white police woman showed up. It took her about 5 to 7 minutes to look for me music book as requested since they all had already refused to give the rest of my belongings. Afterwards, Plaintiff realized that some of music was missing.

11. Approximately two weeks later, Colleen allowed Plaintiff to get some clothes, but her business items (puzzles) were already stolen and others were crumpled into pieces from being put together with puzzle glue and placed in a bin and left on the table I once worked on for me to see. There was no site of Plaintiff's purse with her and her children social security cards neither birth certificate.

12. Afterwards with the assistance of a Clearwater police, Colleen gave Plaintiff a bill owing $1400 for damages, but not for rent. Defendant also stole the property of then named Bright house, a cable box in the amount of $303.

13. This eviction occurred after the arrest of Plaintiff's sexual assaulter and kidnapper Thomas Michael Brown on June 6, 2018.

14. After the eviction of Plaintiff, the Defendant installed cameras at their Tuskawilla property.

## Punitive Damages

Plaintiff since then has suffered delivery of another child due to major depression after the loss of everything during the eviction. Plaintiff has also suffered emotional stress from separation of her four children plus one as a result of eviction on Plaintiff's name.

Plaintiff has also suffered physical damages that are quite explicit to be

spoken on out of embarrassment but Plaintiff is willing to show through exhibits.

Plaintiff is blaming PMMI for the deaths in her family for stealing three important items that meant the world to her, her globe stress ball, her business puzzles (count 26) at a value greater than $100,000.00 according to the owner of then named Creative Creations, and for loss of her place of residence. Since the occurrence of the theft, plaintiff lost a brother, a cousin, and an aunt medically.

For all Plaintiff and her family has went through for the past three years, Plaintiff is asking to be compensated $2 billion for damages financially and physically. As well as for their involvement in covering a crime scene by evicting me with a hole in the wall in the apartment's bathroom. Then charging $1400 as though Plaintiff needed the scene covered. The action of the hole fixing came into after the police report to Clearwater Police department on Thomas Michael Brown.

### Demands

Plaintiff now suffers an unnecessary eviction according to law on her name and is wishing to be compensated as allowed by Florida State Law $2 billion.

Plaintiff is requesting criminal charges for Colleen Rigatti, Rick, deputy Johnston, and the Clearwater supervisor that came out to 1113 Tuskawilla Dr. in Clearwater, FL, as well as the supervisor's team of four or five police officers.

In the eyes of Florida State law and Plaintiff, the above named parties have committed reckless endangerment, fraud, grand theft, accessory to kidnap (1 count), destruction of evidence, second degree murder (3 counts), and hate crime for it all.

1/10/2018-Approval Letter

1/31/2018- Lease Agreement

-13-

1/31/2018-Payment Receipt

1/31/2018-Renter's Insurance

2/24/2018-Lease Statement as of 2/24/2018

3/1/2018- Move in Check List Not Returned (nothing was wrong)

3/6/2018- Current Statement for Laurel Park Apartments

3/7/2018- Past Due Notice

3/8/2018- Past Due Notice

3/9/2018-Past Due Notice

3/10/2018-Past Due Notice

3/11/2018- Past Due Notice

3/12/2018- Past Due Notice

3/13/2018- Past Due Notice (Contradicting payment agreement on late fee went up to $3 for late fee)

3/14/2018- Past Due Notice

3/15/2018- Past Due Notice

3/16/2018- Past Due Notice

3/16/2018-Payment Confirmed ($1,118.50 March balance $0.00)

3/17/2018-Insurance Cancellation Notice

3/19/2018-Payment Receipt

3/26/2018-Insurance Coverage (informed insurance not due until 4/2/2018)

3/26/2018- Insurance conversation asking for landlord renter's insurance (Janet

notice was posted on the door)

3/27/2018-Lease Statement

3/27/2018- Colleen emailed me mentioning pending cancellation of renter's
insurance instead of their own company's insurance information as requested.

3/28/2018- Informed Janet to just add company's rental insurance

3/28/2018-Colleen sent enrollment form for renter's Insurance Coverage

4/3/2018-Payment Confirmed- $972.60 (balance April $0.00)

4/3/2018- Colleen complaint about no rental insurance coverage received
(needed by 4/6)

4/4/2018- Past Due Notice ($50 charge after rent is paid for the month of April)

4/4/2018- Payment Receipt

4/5/2018- Past Due Notice

4/6/2018- emailed copy of active renter's insurance

4/26/2018- Lease Statement (May's rent balance $1,022.60)

5/4/2018- Past Due Notice

5/5/2018- Past Due Notice

5/6/2018- Past Due Notice

5/7/2018- Past Due Notice

5/8/2018- Past Due Notice

5/9/2018- Past Due Notice

5/10/2018- Past Due Notice

5/11/2018- Past Due Notice

5/12/2018- Past Due Notice

5/13/2018- Past Due Notice

5/14/2018- Past Due Notice

5/15/2018- Past Due Notice

5/16/2018- Past Due Notice

5/17/2018- Past Due Notice

5/18/2018- Past Due Notice

5/19/2018- Past Due Notice

5/20/2018- Past Due Notice

5/21/2018- Past Due Notice

5/22/2018- Past Due Notice

5/22/2018- Past Due Notice

5/23/2018- Past Due Notice

5/24/2018- Past Due Notice

5/25/2018- Past Due Notice

5/26/2018- Past Due Notice

5/27/2018- Past Due Notice

5/28/2018-( behind on May's rent; June's rent shown; at this point Plaintiff had lost her job and was too emotional blown to think of unemployment as she had her 2017 income tax on the way in the amount of $7,342.00)

5/29/2018-Past Due Notice $1630.10 (behind on May rent June Rent shown)

5/30/2018-Past Due Notice

5/31/2018-Past Due Notice

6/4/2018-Past Due Notice (late fee of $50 applied)

6/5/2018-Past Due Notice

6/5/2018-Payment Receipt (6/4/2018 date)

6/6/2018-Past Due Notice

6/7/2018-Past Due Notice

6/8/2018-Past Due Notice- $1398.10

6/9/2018-Past Due Notice

6/10/2018-Past Due Notice

6/11/2018-Past Due Notice

6/11/2018-Payment Receipt ($300 still owe $53 for May)

6/12/2018- Past Due rent (June's rent plus $53 left from May =$1125 but shows $1110.00)

6/13/2018-Past Due Notice

6/14/2018-Past Due Notice

6/15/2018-Past Due Notice

6/16/2018- Sent email to colleen informed her I was going through an agency for my June's rent due to lost of a job)

6/16/2018- received out of office message to speak with Gary

-17-

6/16/2018- Gary responded with email asking for "who I am"

6/16/2018-Past Due Notice

6/16/2018-Email sent back with identification

6/17/2018-Past Due Notice

6/18/2018-Past Due Notice

6/19/2018-Past Due Notice

6/20/2018-Past Due Notice (was told Colleen was no longer property manager Notice regarding late rent)

6/21/2018-6/24/2018-Past Due Notice

6/24/2018-Past Due Notice

6/25/2018-Past Due Notice

6/25/2018- emailed Gary to keep in contact about June's rent update (balance $2,707.10 for some of June, July, August)

No further emails from Gary about rent

 6/26/2018- Lease Statement (July's rent added) balance $2,147

6/26/2018- 6/29/2018-Past Due Notice

6/30/2018-Past due Notice-$1,164.10

7/3/2018-Payment receipt- $500 (May rent completely paid, balance $1,659.10)

7/4/2018--Past Due Notice ($50 late fee balance $1,709.10; $664.10- balance for June; $1045 balance July 4)

7/5/2018-Past Due Notice (balance $2,212.10 should be $1712.00)

7/6/2018-7/31/2018-Past Due Notices

7/31/2018-3 month rental assistance from CHAP sent to PMMI

8/1/2018- email to Rick (one introduced as property manager by phone)

(If property manager had signed the rental assistance June, July, and August rent would have been paid)

8/4/2018-8/13/2018-Past Due Notices

8/13/2018- Past due Notice (Charge for writ Possession on 8/7/2018 (my daughter's birthday), $90.00 fee, late for August, shows balance of $3452.10 should be less $500)

Submitted Respectfully,

Brittany Williams

14330 58th St. 58th St. N #4102

Clearwater, FL 33760

Motherof21991@gmail.com

727-288-3196